**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARIA CAMPOS, | No. 1:05-cv-1141-TAG |
| Plaintiff, | MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S APPEAL FROM ADMINISTRATIVE DECISION |
| vs. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security,[1] | ORDER DIRECTING THE CLERK TO ENTER JUDGMENT FOR THE DEFENDANT AND AGAINST THE PLAINTIFF |
| Defendant. | |

## **INTRODUCTION**

Plaintiff Maria Campos ("Claimant") seeks judicial review of an administrative decision denying her claim for Supplemental Security Income ("SSI") benefits due to her disabilities, pursuant to Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 1381 et seq.  Pending before the Court is Claimant's appeal from the administrative decision of the Commissioner of Social Security ("Commissioner").  Claimant filed her complaint on September 2, 2005, and her opening brief on May 11, 2006.  (Docs. 1, 15).  The Commissioner filed an opposition to the appeal on July 6, 2006.  (Doc. 18).  Claimant filed a reply brief on July 20, 2006.  (Doc. 19).

Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties consented to proceed before a United States Magistrate Judge, and, by an order dated March 27, 2006, this action was assigned to the United States Magistrate Judge for all further proceedings.  (Doc. 12).

---

[1] Michael J. Astrue is substituted for his predecessor, Jo Anne B. Barnhart, as Commissioner of the Social Security Administration.  42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

**JURISDICTION**

On August 8, 2002, Claimant protectively filed[2] a "leads/worksheet" for SSI under Title XVI of the Act.[3]  (Administrative Record ("AR") 87).  She filed her application for SSI as an individual with an ineligible spouse on August 23, 2002.  (AR 93-96).  Claimant's application was denied initially and on reconsideration.  (AR 47, 53, 68-71, 73-76).[4]

After timely requesting a hearing, Claimant appeared before Administrative Law Judge ("ALJ") Richard Goodwin on February 17, 2004.  (AR 358-362).  ALJ Goodwin postponed the hearing to enable Claimant to enlist the services of an attorney.  (AR 361-362).  On July 20, 2004,  Claimant appeared with her counsel and the hearing commenced with the assistance of a Spanish interpreter before ALJ Rocklin D. Lyons.  (AR 363-380).  On October 14, 2004, the ALJ issued a written decision finding that Claimant was not disabled and, therefore, not eligible for SSI.  (AR 14-22).  The Appeals Council denied Claimant's request for review on July 19, 2005.  (AR 6-8).  The Appeal Council's decision, therefore, became the final decision of the Commissioner, which is appealable to the district court pursuant to 42 U.S.C. § 405(g).  The initiation of an appeal in the district court must be commenced within sixty (60) days of the Appeal Council's decision.  42 U.S.C. § 405(g).  On September 2, 2005, Claimant timely filed this action.  (Doc. 1).

**STATEMENT OF FACTS**

Most of the facts have been presented in the administrative hearing transcript, the ALJ's decision, and the briefs filed by Claimant and the Commissioner.  A more detailed summary of Claimant's medical records is discussed below.

In her August 2002 application for SSI, Claimant reported that she was born on April 25,

---

[2]  To qualify as an effective SSI claim, an application for benefits must be submitted on a prescribed form. 20 C.F.R. § 416.305.  However, a written statement indicating a person's intent to claim benefits can, if certain coincident and subsequent requirements are met, establish a protective filing date.  20 C.F.R. § 416.340.

[3]  Claimant previously applied for SSI benefits, which the state agency denied on April 17, 2001.  (AR 87-91, 35).  The ALJ dismissed the hearing because Claimant had not first exhausted her state administrative remedies by requesting a reconsideration of the initial denial of benefits.  (AR 43).

[4]  Documents AR 68-71 and 73-76 are the denials of Claimant's SSI application prepared by the Regional Commissioner of the Social Security Administration.

1961, making her 43 years old at the time of ALJ Lyons' decision. (AR 14-22, 93). Claimant alleged that she was incapable of working because of problems with her knees. (AR 93). In Claimant's Request for Reconsideration, she complained that she also suffered from arthritis and pain in her lower back and right knee. (AR 72). Her alleged onset date was August 5, 1997. (AR 87).

At the first hearing, Claimant testified that she was born in Mexico, never attended school, and could not read or write even in her native Spanish. (AR 260-261). During the rescheduled hearing, Claimant reiterated that she did not go to school, could not read, and added that she only could write her name in English. (AR 366, 371, 376). She testified that she was married and had five children, ranging in age between nine and twenty-one years old, who lived with her. (AR 366). Claimant stated that she did not drive. (AR 366, 371). With respect to her work and medical history, she testified that she had always done field work, and her husband still works in the fields. (AR 367). Additional testimony indicated that she had fractured her foot and/or torn a tendon in her knee on August 5, 1997, but continued to work until the job ended in September 1997. (AR 367-368). She underwent surgery on her right knee in March 1998, which did not help but, instead, resulted in her suffering more pain in her leg and lower back that prevents her from working. (AR 367-368, 372).

As to her pain and limitations, Claimant reported that she can stand and/or sit for thirty minutes and cannot lift even five pounds per the doctor's instructions and because it causes her pain to lift anything heavier. (AR 372-373). She can walk about two blocks. (AR 375). She testified that she lays down approximately five times daily for thirty minutes each time, but cannot lay on her right side or back because of the pain in her lower back. (AR 373). She added that she constantly was in pain all along her right side, but it only reached a ten on a one-to-ten scale about four times per month. (AR 374-375). Further, the pain sometimes woke her up at night. (AR 376). Claimant stated that she took Soma, Neurontin, Vicodin, and Celebrex,[5] which

---

[5] Soma is a muscle relaxant used to treat pain caused by muscle spasms. Neurontin is used to treat nerve pain, usually following a herpes zoster infection (the shingles). Vicodin is a combination of a narcotic and acetaminophen prescribed for moderate pain. Celebrex is a non-steroidal anti-inflammatory medication used for pain, including pain and inflammation associated with arthritis.

helped alleviate the pain temporarily. (AR 373-374). She reported that the pain medication often made her dizzy, requiring that she lay down for about fifteen minutes. (AR 375-376).

Regarding her daily activities, Claimant testified that her children did the housework, but she made her bed, helped with the laundry, dressed herself, talked with her family, occasionally cooked, washed the dishes, attended church, and went shopping. (AR 370-372).

**MEDICAL RECORDS AND RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS**

Dr. Sergio Ilic, an orthopedist, prepared reports related to his treatment of Claimant from February 20, 1998, through September 8, 1998, for her August 5, 1997, work-related injury to her right knee. (AR 162-180). Dr. Ilic's reports were addressed and submitted to an attorney who apparently was representing Claimant in a workers compensation action. (Id.; see AR 378 (ALJ finding Dr. Ilic's final report, which was related to workers compensation case "highly significant.")). Dr. Ilic reported that he first saw Claimant on February 20, 1998, for a torn medial meniscus in her right knee after she fell while picking grapes.[6] On March 23, 1998, Dr. Ilic performed arthroscopic surgery on Claimant's right knee. His post-operative diagnosis included (1) normal medial meniscus, right knee joint; (2) chondromalacia of the medial femoral condyle, grade III and of the medial tibial plateau, grade II; and (3) chronic synovitis. (AR 176-177). During her first- and second-week post-operative appointments, Claimant reported that she had significant pain and was still using crutches. Dr. Ilic told her to begin physical therapy as soon as possible or she would have a permanent limp. In the interim, Claimant should continue doing exercises on her own. (AR 172-175). Claimant started physical therapy before her April 21, 1998, appointment, at which Dr. Ilic observed that she no longer used crutches and her range of motion had improved. (AR 171). Dr. Ilic again saw Claimant in May and June 1998, reporting both times that she was improving but still reported pain in her knee. (AR 168-170). On July 22, 1998, Dr. Ilic noted that she continued to complain of pain in her right knee that radiated to the thigh and quadriceps. (AR 167). His examination indicated that she continued to improve. (Id.). In his final report, dated September 8, 1998, Dr. Ilic concluded that

---

[6] Dr. Ilic noted that Claimant had been seeing another doctor, who ordered an MRI in October 2007, which revealed the torn meniscus. (AR 179).

4

Claimant's status was permanent and stationary. Dr. Ilic reported that she was a medically qualified injured worker, but noted that she had not started vocational rehabilitation. He further reported that Claimant continued to complain of right knee pain, intermittent swelling, and crepitation. (AR 162-164). After examining her, Dr. Ilic's assessment was that Claimant's work restrictions precluded her from climbing, running, jumping, kneeling, squatting, walking on uneven ground, and prolonged weight bearing. (AR 165). He added that Claimant would need to continue to see a doctor for at least one more year for various medications and injections if the pain became severe. (Id.).

Dr. Ruston Damania, a Board-eligible doctor of internal medicine, examined Claimant and prepared an evaluation at the request of the state agency on March 16, 2001. (AR 181-186). Dr. Damania noted that Claimant complained that, for the past three years, her right knee became swollen and painful at night. She presently takes only thyroid medication. Claimant added that she has not fallen down and uses no assistive devices or braces. Claimant further reported that, because she does not speak English, she has not been able to find a job. (AR 181). Dr. Damania's physical examination revealed no abnormalities other than Claimant's slight obesity. (AR 182). More significantly, Claimant's use of her upper and lower extremities, including range of motion, were within normal limits, although she complained of pain during the range-of-motion test. (AR 183-184). Dr. Damania observed that, when squatting, Claimant kept her right leg extended. (AR 185). Dr. Damania's diagnosis was "[s]tatus post industrial accident on the right knee with chondromalacia of Grade II to Grade III of the media femoral condyle and medial tibial plateau, status post arthroscopic chondroplasty and partial synovectomy." (Id.). She determined that Claimant could work an eight-hour day with normal breaks with no limitations on sitting, standing, or walking. Although Claimant may be limited in her ability to lift extremely heavy weights, and, possibly, crouching, and squatting, she had no other postural, manipulative, visual, or communicative limitations. (AR 186).

The record includes two residual functional capacity ("RFC") assessments prepared by different state physicians based on their independent review of the medical records. The first assessment was completed on April 12, 2001 and reaffirmed on September 21, 2001 (the "2001

1   assessment"). (AR 188-198). The second nonexamining report was prepared on December 12,
2   2002 and reaffirmed on April 22, 2003 (the "2002 assessment"). (AR 240-251). Because they
3   are almost identical, this summary will identify only any differences between the two
4   assessments. The state physicians reported that Claimant's exertional limitations included
5   occasionally lifting fifty pounds, frequently lifting twenty-five pounds, sitting, standing and/or
6   walking six hours in an eight-hour workday, and unlimited pushing and/or pulling. (AR 189,
7   241). Claimant was limited to occasional climbing, stooping, kneeling, crouching, and crawling
8   due to objective tests reflecting that she had difficulty squatting and suffered pain on range-of-
9   motion examinations. (AR 190 (explains stated reasons), AR 241 (no explanation)). The 2001
10  assessment additionally restricted Claimant with respect to walking on uneven terrain ("avoid
11  concentrated exposure"); the 2002 assessment, however, contains no such limitation. (Compare
12  AR 192 with AR 244).

13       Claimant was treated at Alta Family Health Clinic (the "Clinic") from October 19, 2001
14  through May 20, 2002 for her general health, hypothyroidism, chronic pain in her right leg, and
15  pain in her lower back. X-Rays of her lower back revealed no disk disease or abnormalities.
16  (AR 201-214). The Clinic referred Claimant to Dr. J.R. Lee, an orthopedist with Tulare
17  Orthopedic, who diagnosed right leg pain, secondary to lumbar radiculopathy. Dr. Lee ordered
18  an MRI, which, according to the radiologist's September 11, 2002, report, revealed degenerative
19  disk and facet disease at the right L3 and L4-L5 levels, with no disk rupture. (AR 309-310).
20  Dr. Lee recommended that Claimant return to her family doctor for continued management of the
21  spinal abnormalities. (AR 216-220).

22       Claimant first presented at Dinuba Medical Center ("DMC") on August 28, 2002,
23  complaining of pain that traveled from her right hip to the bottom of her right foot, which
24  continued to worsen since her surgery five years earlier. The treating doctor recommended
25  physical therapy, X-Rays of her right knee, and prescribed Celebrex. (AR 227). A September
26  13, 2002, radiology report ordered by DMC indicated that there might be a slight narrowing of
27  the joint space in her right knee. (AR 222).
28

On or about December 28, 2002, Dr. Glenn Kissinger[7] ordered routine medical tests and blood work.[8] (AR 299-307). He also ordered an X-Ray of Claimant's lower back. (AR 308). Another DMC provider referred Claimant to Sierra Kings District Hospital (SKDH) for physical therapy in September 2002. (AR 297). Claimant complained to DMC providers of back pain in February 2003 and right leg pain in September 2003. (AR 267, 291). Dr. Kissinger treated Claimant on September 30, 2003, noting that she had been seeing a chiropractor, and diagnosed her with sciatica and chondromalacia. (AR 264). Dr. Kissinger noted on February 10, 2004, that the chiropractic treatment had decreased Claimant's back pain, had she continued to have pain radiating down her right leg. His diagnosis referenced her L3-4 and L5-S1 spinal disks, and he mentioned the possibility of surgery. (AR 329). On March 18, 2004, a different DMC provider reported that Claimant complained of right back and leg pain, although she had come in for treatment of a yeast infection. (AR 322). On March 31, 2004, Dr. Kissinger apparently referred Claimant to the mental health department ("refer to M.H.") after she had gone to the emergency room complaining of chest pains, which seemingly were stress-related. (AR 319). The majority of Claimant's DMC appointments between November 20, 2002 and March 31, 2004, except for her chiropractic treatments, were for routine medical care, unrelated ailments, and medication management, and Claimant rarely was treated by Dr. Kissinger. (See generally AR 254-294, 319-335).

Claimant initially started seeing a DMC chiropractor on March 17, 2003, who planned to treat her for, inter alia, a decreased range of motion and increased muscle spasms in her back. (AR 289). Claimant had two appointments with the chiropractor in April 2003. (AR 286-287). She next saw the chiropractor in August 2003. (AR 268). From October 6, 2003 through March 31, 2004, Claimant had chiropractic treatments approximately every two weeks. (AR 253, 260-263, 320, 328, 330, 333).

///

---

[7] Dr. Kissinger is affiliated with Dinuba Medical Center. (See, e.g., AR 225)

[8] Most, if not all, tests, radiological diagnostics, laboratory work, etc., ordered by DMC providers were performed at Sierra Kings District Hospital. (See, e.g., AR 299-308).

7

1   On September 18, 2002, the Physical Therapy Department ("PT Dept") at SKDH
2 performed an initial evaluation of Claimant.  (AR 232-233).  The PT Dept reported that
3 Claimant's problem, other than her subjective complaints of pain and limitations secondary to
4 pain, was a "[d]ecreased ability to perform single-heel raises and single-knee squats bilaterally,
5 worse on the right."  (AR 233).  The PT Dept stated that no further therapy was planned because
6 Claimant told them that she planned to return to Mexico.  (Id.).  On April 7, 2004, Claimant
7 again underwent an evaluation for treatment of left back, neck, and shoulder pain that had started
8 to bother her three days earlier.  (AR 348).  The therapist reported no abnormalities other than
9 tenderness on palpitation of the left shoulder and back muscles, mild guarding at the end of the
10 range of motion exercises, which otherwise were within normal limits, and mild guarding when
11 Claimant changed positions.  (AR 348-349).  Subjectively, Claimant told the therapist that she
12 suffered from daily headaches and was dizzy every morning due to her antidepressant
13 medication.  She acknowledged that she did not apply ice or heat to her back, neck, or shoulder.
14 Both an assessment and a plan were prepared, with an ultimate goal that Claimant return to her
15 previous level of functioning.  (AR 349).  The PT Dept discharged Claimant on April 29, 2004,
16 because she had not continued with the therapy plan; i.e., she had not attended the scheduled
17 sessions.  (AR 346).

## STANDARD OF REVIEW

19   Congress has provided a limited scope of judicial review of a Commissioner's decision.
20 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision to deny benefits, made
21 through an ALJ, when the decision is based on the proper legal standards and is supported by
22 substantial evidence.  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005).  Substantial evidence
23 is more than a mere scintilla but less than a preponderance.  McAllister v. Sullivan, 888 F.2d
24 599, 601-602 (9th Cir. 1989) (quotations omitted).  It is "such relevant evidence as a reasonable
25 mind might accept as adequate to support a conclusion."  Webb, 433 F.3d at 686, citing
26 Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).  Moreover, such
27 "inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" are
28 accorded the same consideration as is substantial evidence as defined above.  Mark v. Celebrezze,

348 F.2d 289, 293 (9th Cir. 1965).  On review, the court considers the record as a whole, not just the evidence supporting the decision of the Commissioner.  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (quotation and citation omitted).

It is the role of the trier of fact, not this Court, to resolve conflicts in evidence. Richardson, 402 U.S. at 400, 91 S.Ct. at 1426-1427.  If the evidence supports more than one rational interpretation, the court must uphold the decision of the ALJ.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  Moreover, if there is substantial evidence to support the administrative findings, or if there is conflicting evidence that would support a finding of either disability or non-disability, the Commissioner's decision is conclusive.  Sprague v. Bowen, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  Nevertheless, a decision supported by substantial evidence will be set aside if the proper legal standards were not applied in weighing the evidence and making the decision.  Brawner v. Secretary of Health and Human Services, 839 F.2d 432, 433 (9th Cir. 1987).

## RELEVANT LEGAL FRAMEWORK

To qualify as disabled under Title XVI of the Act, an applicant for SSI benefits must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The Act also provides that a claimant shall be determined to be under a disability only if his impairments are of such severity that she "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

## SEQUENTIAL EVALUATION PROCESS

The Commissioner has established a five-step sequential evaluation process for determining whether a person is disabled under Title XVI of the Act.  20 C.F.R. § 416.920.  Step one determines if she is engaged in substantial gainful activities.  If she is, benefits are denied. 20 C.F.R. § 416.920(a)(4)(I), (b).  If she is not, the decision maker proceeds to step two, which

determines whether claimant has a medically severe impairment or combination of impairments that meet the duration requirements set forth in 20 C.F.R. § 416.909; i.e. the impairment(s) are expected to result in death or continuously lasted or be expected to last at least twelve months. 20 C.F.R. § 416.920a(4)(ii), (c). If the claimant does not have a severe impairment, a combination of impairments, or meet the duration requirement, the disability claim is denied. Id.

If the impairment is severe, the evaluation proceeds to the third step, which compares claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 416.920(a)(4)(iii), (d); 20 C.F.R. § 404 Subpt. P App. 1. If the impairment meets or equals one of the listed impairments and satisfies the duration requirement, claimant is conclusively presumed to be disabled. 20 C.F.R. §§ 416.909, 416.920(a)(4)(iii), (d). If the impairment is not one conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents claimant from doing work performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. §§ 416.920(a)(4)(iv), (e); 416.960(b). If the claimant cannot perform this work, the fifth and final step in the process determines whether she is able to perform other work in the national economy in view of her age, education and work experience. 20 C.F.R. §§ 416.920(a)(4)(v), (f) and (g); 416.960(b) and (c). See Bowen v. Yuckert, 482 U.S. 137 (1987).

The initial burden of proof rests upon a claimant to establish that she "is entitled to the benefits claimed under the Act." Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971) (citations omitted). In terms of the five step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative duty* to assist a claimant to develop the record . . . complicates the allocation of burdens" such that "the ALJ shares the burden at each step." Tackett v. Apfel, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999) (italics in original). The initial burden is met once a claimant establishes that a physical or mental impairment prevents her from engaging in her previous occupation. The burden then shifts to the Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2) that a "significant number of jobs exist in

the national economy" which claimant can perform. Kail v. Heckler, 722 F.2d 1496, 1498 (9th Cir. 1984).

## ALJ'S FINDINGS

The ALJ found at step one that Claimant had not engaged in substantial gainful activity since the date that she filed her Title XVI application.[9] (AR 17, 20). At step two, the ALJ determined that Claimant had "degenerative disc disease and residuals from right knee arthroscopic chondroplasty of the medial femoral condyle and medial tibial plateau and partial synovectomy of the right knee joint," which he considered to be severe impairments. (AR 17, 21). At step three, the ALJ concluded that Claimant's impairments did not meet or equal the listings set forth in 20 C.F.R. § 404 Subpt. P App. 1. (AR 18, 21). The ALJ specifically stated that he found Claimant's testimony regarding her limitations and her subjective complaints only partially credible, noting that neither is supported by the objective evidence or when evaluated under SSR 96-7p. (AR 18, 21).

At step four, the ALJ found that Claimant was not able to perform her past relevant work as a farm laborer and fruit packer. (AR 17, 21). At step five, the ALJ found that Claimant was an illiterate, younger individual who could not communicate in English. (AR 21). He further found that Claimant had the residual functional capacity ("RFC") to "lift and/or carry 50 pounds occasionally and 25 pounds frequently, and stand, walk and sit 6 hours in an 8-hour workday, with occasional climbing, stooping, kneeling, crouching and crawling, and with limited walking on uneven surfaces." (AR 21). Given Claimant's exertional capacity for light work, in combination with her age, education and work experience, the ALJ concluded that she could perform a wide range of unskilled, light work, which necessitated that he find her "not disabled" under Rule 202.16. (AR 20, 21). The ALJ, therefore, found that, because Claimant was not disabled under the Act, she was not eligible for SSI. (AR 22).

///

---

[9] ALJ Lyons noted that, because Title XVI benefits are not retroactive to a date before the filing of the application, there was no need to determine if Claimant was disabled before August 1, 2002. (AR 17); see 20 C.F.R. 416.335 (stating that an individual becomes eligible for SSI benefits the month after he files his SSI application if all other requirements are met).

**ISSUES**

In her briefs, Claimant asserts that the Commissioner erred as a matter of law. Claimant's allegations contend that:

(A)  The ALJ erred in rejecting the opinion of Claimant's current treating physician; and

(B)  The ALJ erroneously found Claimant's testimony only partially credible.

As discussed above, this Court must uphold the Commissioner's determination that claimant is not disabled if the Commissioner applied the proper legal standards and there is substantial evidence in the record as a whole to support the decision.

**DISCUSSION**

**(A)  Rejection of Current Treating Physician's Opinion**

Claimant first contends that the ALJ erred in rejecting the opinion of Dr. Kissinger, who had been her treating physician since August 28, 2002, and, instead, adopting the opinions of earlier treating and non-treating doctors, none whom were aware of Claimant's more recent impairments. (Doc. 15, p. 6, 10-11; Doc. 19, pp. 1-3). Claimant argues that, because the limitations imposed on Claimant by Dr. Kissinger are supported by the objective evidence, the ALJ should have adopted his opinion. (Doc. 15, pp. 7-8; Doc. 19, pp. 3-4). Claimant further asserts that the ALJ failed to set forth the requisite specific and legitimate, or clear and convincing, reasons for discounting Dr. Kissinger's opinion. (Id.).

The courts distinguish among the opinions of three types of physicians:  treating physicians, physicians who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("nonexamining physicians"). Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). As a general rule, a treating physician's opinion is given special weight because of his or her familiarity with a claimant's physical condition. Id.; Fair v. Bowen, 885 F.2d 597, 604-605 (9th Cir. 1989); see also Smolen v. Chater, 80 F. 3d 1273, 1285 (9th Cir. 1996) ("Because treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians"); Social Security Ruling 96-2p (the opinions of a treating physician ordinarily should be given great weight).

Regardless of the weight given to a treating physician's medical opinion, it is not binding on the ALJ with respect to the ultimate determination of disability. See Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194-1195 (9th Cir. 2004) (treating physician had opined that claimant "met or equaled the criteria" for a listed impairment under 20 C.F.R. § 404 Subpt. P App. 1, § 105C); Magallanes v. Bowen, 881 F. 2d 747, 751 (9th Cir. 1989) ("treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability"). Accordingly, although entitled to great weight, a treating physician's opinion is not conclusive and may be rejected by the ALJ under appropriate circumstances. Where a treating physician's opinion is not contradicted by another physician, it may be rejected by the ALJ only for clear and convincing reasons supported by substantial evidence in the record. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998) (quotations and citations omitted). If a treating physician's opinion is contradicted by another physician, the ALJ may reject the treating physician's opinion only by providing specific and legitimate reasons supported by substantial evidence in the record for so doing." Id. (quotations and citations omitted). The same test applies to examining physicians: the ALJ must give clear and convincing reasons for rejecting uncontradicted opinions, or "specific and legitimate reasons supported by substantial evidence in the record" for rejecting those opinions that have been contradicted. Lester, 81 F.3d 821, 830-831.

Courts within the Ninth Circuit have recognized various reasons deemed sufficient for the ALJ to disregard a treating or examining physician's opinion. These reasons include: conflicting medical evidence, the absence of regular medical treatment during the alleged period of disability, and the lack of medical support for physicians' reports that are based substantially on the claimant's subjective complaints of pain. Flaten v. Secretary of Health & Human Svcs., 44 F.3d 1453, 1463-1464 (9th Cir. 1995); Fair, 885 F.2d at 604. The ALJ also may disregard a physician's opinion that is "brief and conclusionary in form with little in the way of clinical findings to support [its] conclusion." Magallanes, 881 F.2d at 751 (citations omitted). In contrast, vague, broad, or generalized reasons are insufficient grounds for the ALJ to reject a treating physician's opinion. McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).

In his decision, the ALJ explained that he did not accord much weight to Dr. Kissinger's June 2004 assessment because (1) his treatment of Claimant had been "conservative and routine;" (2) the assessment was inconsistent with his medical records; and (3) the assessment appeared "to be an accommodation in an attempt to help the claimant obtain disability" benefits. (AR 18).  ALJ Lyons added that neither an aggressive treatment regimen, nor a regimen more suitable for chronic pain syndrome, had been prescribed.  (AR 18-19).

Dr. Kissinger's June 2, 2004, questionnaire diagnosed Claimant as suffering from (1) chondromalicia of the right knee; (2) pain in the right knee and lower back; (3) chronic synovitis in the right knee; (4) right hip pain secondary to a compensated gait; and (5) functional disalignment of the right foot.  (AR 313).  He identified her symptoms as pain, chronic fatigue, headaches, back pain, and "poor sleep."  (Id.).  With respect to Claimant's pain, he noted that she reported it as ten on a ten point scale, although he objectively rated it as five out of ten.  (Id.). Dr. Kissinger reported that Claimant had undergone physical therapy and seen a chiropractor without relief.  At the time that he completed the questionnaire, he stated that Claimant was taking Vicodin and Celebrex for the pain.  He added that she was depressed due to her physical condition, and her symptoms frequently interfered with her ability to pay attention or concentrate enough to perform even simple tasks.  (AR 314).  As to her limitations, Dr. Kissinger stated that Claimant (1) could maintain attention for thirty minutes; (2) could not walk one block without rest or severe pain; (3) could sit for ten minutes and stand for fifteen minutes; and (4) sit, stand and/or walk less than two hours in an eight-hour work day.  (AR 314-315).  In addition, he reported that Claimant could rarely lift ten pounds and never crouch or climb ladders or stairs. (AR 316).

As an initial matter, because Dr. Kissinger's opinion is contradicted by the assessments and reports of other physicians, the ALJ must provide "specific and legitimate reasons supported by substantial evidence in the record" for rejecting Dr. Kissinger's opinion.  Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998).

Contrary to Claimant's assertion, Dr. Kissinger's report is not supported by the medical evidence.  Although a September 2002 MRI indicated that Claimant had degenerative disk and

facet disease in her lumbar spine, the orthopedist believed that what he diagnosed as right leg pain, secondary to lumbar radiculopathy, could be treated by a family doctor. (AR 216-220, 309-10). X-Rays showed a slight narrowing of the joint space in her right knee. (AR 222). In addition, there are only scattered reports by Dr. Kissinger and other DMC providers of Claimant reporting severe pain, and in none of them did she complain that she could was limited in her abilities to live a relatively normal life. (See generally Medical Records). In most of her complaints of pain to various providers, Claimant mentioned headaches and back pain radiating down her right leg. (See AR 267, 291, 322, 329, 348-349). Moreover, although in the questionnaire, Dr. Kissinger reported that Claimant had undergone physical therapy and other treatment modalities, she actually had not attended therapy sessions after her 1998 surgery and, although see did not see the chiropractor consistently, Dr. Kissinger reported that she had improved with the limited treatment she underwent. (AR 329; Medical Records). Further, of the two pain medications that Dr. Kissinger reported Claimant was taking, there is no indication how often or for how long she took the medication. (AR 314). Only Vicodin is prescribed on an "as needed" basis for immediate relief of moderate pain, and there is nothing in the record regarding how often this medication was prescribed or refilled, the quantity prescribed, or how many pills Claimant was told she could take each day. (See generally Administrative Record). As the ALJ stated in his reasons for rejecting Dr. Kissinger's opinion, it imposes restrictions on Claimant that are inconsistent with the medical evidence, including her subjective complaints to him and other treating providers, and, had Dr. Kissinger believed that Claimant's pain was as severe as he opined in his questionnaire, the course of treatment he recommended appears conservative and unlikely to resolve her alleged symptoms. The lack of medical support for Dr. Kissinger's report, which is based substantially on Claimant's intermittent, subjective complaints of pain, provides sufficient reason for the ALJ to reject his opinion. Flaten v. Secretary of Health & Human Svcs., 44 F.3d 1453, 1463-1464 (9th Cir. 1995).

In September 1998, Dr. Ilic opined that Claimant could start working, although not at her previous jobs, and reported that she likely would continue to have some recurring problems in her right knee, including pain, for approximately one year, which would necessitate medical

1    intervention. (AR 162-165). When examining consultant Dr. Damania completed his
2    evaluation, he noted that, despite Claimant's reports of pain, she took no medications other than
3    for her hypothyroidism. Dr. Damania found that Claimant's only limitations were with respect to
4    lifting extremely heavy weights and, perhaps, crouching and squatting, based on his examination,
5    mobility tests, her denial of any falls, and the fact that she used no assistive devices. (AR
6    181-186). It also is noteworthy that the physical therapist's evaluation of Claimant in April 2004
7    confirmed Dr. Damania's findings that Claimant's exertional limitations were within normal
8    limits. (AR 183-184, 348-349). Further, Claimant told Dr. Damania that she was not working
9    because she could not speak English, not because of any physical impediment. (AR 181).
10   Moreover, even after the September 2002 MRI revealed degenerative disk disease, one of the
11   state physicians concluded, in the RFC assessment, that Claimant was limited due to postural
12   restrictions only. (AR 240-251). Nothing in the medical records contradicts these assessments.

13   Based on the foregoing, the ALJ's stated reasons for rejecting Dr. Kissinger's assessment of
14   the extent of Claimant's limitations were more than sufficient to exceed the "specific and
15   legitimate reason" test required to reject a treating physician's opinion and, in contrast, appears to
16   have been prepared to enable Claimant to collect SSI benefits. Reddick, 157 F.3d at 725; (AR
17   18-19). Accordingly, the undersigned finds no error with respect to the ALJ's rejection of Dr.
18   Kissinger's opinion in the instant case.

19   **(B)   ALJ Erroneously Found Claimant's Testimony only Partially Credible**

20   Claimant next alleges that the ALJ erred with respect to his finding that Claimant's
21   testimony was only partially credible because (1) he neglected to follow SSR 96-7p and the
22   relevant regulations when assessing her testimony regarding her symptoms, and (2) her
23   longitudinal medical record evidenced that she consistently sought treatment for residuals from
24   her right knee arthroscopy and back knee pain. (Doc. 15, pp. 11-13). The undersigned disagrees.

25   A two-step analysis applies at the administrative level when considering a claimant's
26   subjective credibility. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the claimant
27   must produce objective medical evidence of an impairment and show that the impairment could
28   reasonably be expected to produce some degree of symptom. Id. at 1281-82. The ALJ, however,

cannot disregard the claimant's testimony based solely on the lack of supporting, objective medical evidence. Robbins v. Social Security Admin., 466 F.3d 880, 883 (9th Cir. 2006); Light v. Social Security Admin., 119 F.3d 789, 792 (9th Cir.1997); SSR 96-7p.

If the claimant satisfies the first step of the Smolen test - and if there is no evidence of malingering - the ALJ can reject the claimant's testimony about the severity of his or her symptoms "only by offering specific, clear and convincing reasons for doing so." Smolen, 80 F.3d at 1281. Such specificity is crucial so as to enable effective judicial review. See Mersman v. Halter, 161 F. Supp. 2d 1078, 1086 (N.D. Cal. 2001) ("The lack of specific, clear, and convincing reasons why Plaintiff's testimony is not credible renders it impossible for [the] Court to determine whether the ALJ's conclusion is supported by substantial evidence"); SSR 96-7p (the ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight").

The factors that the ALJ may consider, and use as a basis for finding that a claimant's subjective testimony is not credible, include: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors such as movement, activity, and environmental conditions; (3) the type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions, and (6) the claimant's daily activities. Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (en banc); 20 C.F.R. § 416.929.

Pursuant to SSR 96-7p, a claimant's

> longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements. Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

This ruling, however, further provides that a claimant's failure to seek continuous medical

treatment may cast doubt on his credibility as to his symptoms and pain, unless there are plausible reasons explaining why the claimant did not attempt to obtain treatment. SSR 96-7p. For example, if all of the available treatments had been tried, or the type of treatment would violate the claimant's religious beliefs, his refusal to continue seeking treatment would not be an adequate reason for finding his testimony not credible. Id.

In the instant case, the ALJ found, based on objective evidence, that Claimant has impairments that could cause pain. Smolen, 80 F.3d at 1281-82; (AR 17-18, 21). ALJ Lyons also acknowledged that Claimant's "longitudinal medical record" established that she consistently had been seeking relief for problems associated with her right knee surgery. (AR 18). Accordingly, the ALJ had to provide "specific, clear and convincing reasons" for concluding that Claimant's testimony concerning the extent of her pain and the limitations it imposed on her ability to function was not credible. Smolen, 80 F.3d at 1281. The ALJ properly considered the factors set forth in this Circuit's precedential case law, the relevant regulations, and SSR 96-7p, in finding that Claimant's testimony was not credible. (AR 18-19).

In accordance with the factors that the ALJ was bound to consider, he first noted that Claimant recanted that she was as limited by her pain with respect to the daily activities that she could perform than she previously claimed. (AR 19). Moreover, ALJ Lyons found that the objective medical evidence did not support a conclusion that she suffered the degree of pain to which she testified. (AR 18-19, see Section (A) and Medical Records above). Although the ALJ did not delineate all of the reasons for discounting Claimant's testimony, he stated that he had considered SSR 96-7p in evaluating her subjective complaints and found that her testimony was not entirely credible. (AR 18). Some of the factors that may be considered under SSR 96-7p, and 20 C.F.R. 416.929, include whether the claimant follows prescribed treatment modalities, changes treating sources in an attempt to obtain relief, and takes pain medications. 20 C.F.R. § 416.929, SSR 96-7. As discussed above, Claimant did not attend her prescribed physical therapy sessions, changed treating sources only once since her surgery, and, before 2002, did not take any pain medication. (See Section (A) and Medical Records). Moreover, she rarely informed her doctors that she suffered pain and, when she did, it was not to the extent that she

testified at the hearing.  Finally, the only side effect to any prescribed medications noted in her records were morning dizziness when she was taking the antidepressant drug Effexor, which was discontinued several months before her June 2004 hearing.  This directly contradicts her assertions that she had to lay down three times daily because her pain pills made her dizzy.  (AR 329; see above).

For the reasons discussed above, this Court finds no error in the ALJ's analysis, which was based on proper legal standards.  Accordingly, this Court ORDERS:

1. That Claimant's Social Security complaint be DENIED; and

2. That Judgment be ENTERED for Defendant Michael J. Astrue and against Claimant Maria Campos.

IT IS SO ORDERED.

Dated:   **March 28, 2007**                                          /s/ Theresa A. Goldner
**j6eb3d**                                                    UNITED STATES MAGISTRATE JUDGE